UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SG ALTERNATIVE TITLE TRUST 2021-MF1
a/k/a SALUDA GRADE ALTERNATIVE
TITLETRUST 2021-MF1,

                Index No. 25-cv-00648-FB-VMS

            Plaintiff,

  -against-

                **FIRST AMENDED**
                **COMPLAINT**

MICHELLE ZELL, ROSS WIGON, RIVERSIDE
ABSTRACT, LLC, AND SHAUL C. GREENWALD.

              Defendants.
-----------------------------------------------------------------X

        SG ALTERNATIVE TITLE TRUST 2021-MF1 a/k/a Saluda Grade Alternative Title

Trust 2021-MF1 ("Plaintiff"), by its attorneys at the Piel Law Firm, LLC and Neufeld,

O'Leary & Giusto, as and for its Complaint, respectfully allege as follows:

## <u>NATURE OF PROCEEDINGS</u>

        1.     Plaintiff commences this action based upon the Defendants Michelle Zell

and Ross Wigon's professional malpractice in appraising certain real property and title

company Riverside Abstract, LLC and escrow agent Shaul C. Greenwald's improper

handling of a loan and related undisclosed flip sale of said real property without good

funds, both of which resulted in damages to the Plaintiff.

## <u>THE PARTIES</u>

        2.     Plaintiff is a Delaware Statutory Trust established under Title 12, Chapter

38 of the Delaware Code, and is authorized to maintain this action pursuant to 12 Del.

Code § 3804(a).  A Delaware Statutory Trust is an unincorporated association, and takes

the citizenship of its "members."  *Americold Realty Trust v. Conagra Foods, Inc.*, 577 U.S.

378, 381 (2016). The members of a Delaware Statutory Trust are its beneficial owners. *MSR Trust v. Nationstar Mortg. LLC*, 2021 U.S.Dist. LEXIS 175813 (S.D.N.Y. 2021). The beneficial owner of Plaintiff is Saluda Grade Alt Mortgage Trust 2021-MF1, which is also a Delaware Statutory Trust. The beneficial owner of Saluda Grade Alt Mortgage Trust 2021-MF1 is not a citizen of New York or Texas.

3.      Upon information and belief, Defendant Michelle Robyn Zell ("Appraiser 1") is an individual residing at 336 Sackett Street, Brooklyn, New York, and is a citizen of the State of New York for diversity jurisdiction.

4.      Upon information and belief, Defendant Ross Wigon ("Appraiser 2") (Appraiser 1 and Appraiser 2 are collectively, "Appraiser Defendant") is an individual residing at 6 East 12th Street, Apartment 3, New York, New York, and is a citizen of the State of New York for diversity jurisdiction.

5.      Upon information and belief, Defendant Riverside Abstract, LLC ("Title Company") is a limited liability company, with a primary address of 3839 Flatlands Avenue, Suite 208, Brooklyn, New York and a satellite office located at 20333 State Highway 249, Suite 200 Houston, Texas. The Title Company has two (2) members - Saul C. Greenwald and Yoel Zagelbaum.

6.      Upon information and belief, Shaul C. Greenwald was the escrow agent / Title Attorney on this transaction ("Title Attorney"). Saul C. Greenwald is a citizen of the State of New York for diversity jurisdiction residing at 1010 East 22nd Street Brooklyn, NY 11210. Mr. Greenwald is an attorney admitted to practice in the State of New York.

7.      Upon information and belief, Yoel Zagelbaum is a citizen of the State of New York for diversity jurisdiction residing at 1737 Burnett Street Brooklyn, NY 11229.

## JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

## VENUE

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

10.     Defendant Appraiser 1's principal place of business is 61-63 Crosby Street, 3rd Floor, New York, New York, within this judicial district.

11.     Defendant Appraiser 2's principal place of business is 61-63 Crosby Street, 3rd Floor, New York, New York, within this judicial district.

12.     Upon information and belief, most of the appraisal drafting took place at 61-63 Crosby Street, 3rd Floor, New York, New York, within this judicial district.

13.     The Engagement Letter for Professional Valuation Service originated in New York, within this judicial district.

14.     Defendant Title Company's principal place of business is 3839 Flatlands Avenue, Suite 208, Brooklyn, NY 11234.

## FACTS

15.     These claims arise out of a $13,741.727.50 loan ("Loan") funded by Pacific Private Money, Inc. ("PPM" or "Lender") to Sabine Portfolio LLC ("Borrower"), for the Borrower's purchase and rehabilitation of real estate commonly known as 111 West Pine Avenue, Orange County, Texas 77630, Orange County Property Account Number

014385-000030 ("Property"), a 40-building multifamily garden apartment complex containing a mix of one-story and two-story buildings and 200 residential units. The Property contains two additional units that are used as a leasing office and an event space. The Property contains 149,288 square feet of gross building area and 11.76 acres of site area.

16.     The Loan was documented by that Promissory Note, dated February 9, 2022, in the original principal amount of $13,741.727.50, executed by Abraham Wieder, sole member of the limited liability company, Sabine Park APT, LLC who is the sole member of the Borrower and guarantor of the Loan.

17.     Plaintiff purchased the Loan and all rights associated therewith, including without limitation, this chose in action and the right to pursue litigation related to the Loan, from the Lender by Assignment of Commercial Mortgage, Security Agreement, Fixture Filing and Assignment of Leases and Rents dated June 16, 2023.

18.     The Loan was secured by the Property.

19.     The Borrower failed to make payments as required under the Loan.

20.     The Plaintiff accelerated the balance due under the loan documents and demanded that the Borrower pay all outstanding funds, but the Borrower refused to do so.

21.     Plaintiff commenced a foreclosure proceeding and ultimately bid the Property in.

22.     The Loan defaults have resulted in the following losses to the Lender:

$11,741,727.50     Unpaid Principal Balance, as of January 15, 2025
$  3,335,439.00    Default Interest at 12.99%, from 12-2-22 – 2-5-25 (796 days at
                    $4,190.25 per diem)

| | |
|---|---|
| $ 180,818.34 | Lender Advance Fees, as of September 1, 2023 |
| $15,257,984.84 | Total Due 2-5-25 |
| ($ 5,834,600.00) | Estimated Net Foreclosure Sales Proceeds |
| $ 9,423,384.84 | Total Due 2-5-25 |

## BREACHES BY THE APPRAISER DEFENDANTS

23.     This is a professional appraiser malpractice case, not a breach of contract case, however, the appraiser retention agreement states:

### GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by the law of the state in which Bowery Valuation's office as specified in this Agreement is located [New York], exclusive of that state's choice of law rules. The parties agree that any legal proceeding brought by either party to interpret or enforce this Agreement, or to enforce an arbitration award entered pursuant to this Agreement, shall be brought in a state or federal court having jurisdiction over the location of Bowery Valuation's office as specified in this Agreement [New York], and the parties hereby waive any objections to the personal jurisdiction of said court.

24.     The Uniform Standards of Professional Appraisal Practice ("USPAP") Definitions require all real estate appraisers to be non-corporate entities (individuals): "APPRAISAL PRACTICE: valuation services performed by an individual acting as an appraiser, including, but not limited to, appraisal and appraisal review.  [Emphasis in original.]  Comment: 'Appraisal practice' is provided only by appraisers, while valuation services are provided by a variety of professionals and others."

25.     The USPAP Ethics Rule also requires individual appraisers comply with USPAP:  "An appraiser must comply with USPAP when obligated by law or regulation, or by agreement with the client or intended users. In addition to these requirements, an individual should comply any time that individual represents that he or she is performing the service as an appraiser.  Comment: This Rule specifies the personal obligations and responsibilities of the individual appraiser. An individual appraiser employed by a group

or organization that conducts itself in a manner that does not conform to USPAP should take steps that are appropriate under the circumstances to ensure compliance with USPAP." STANDARDS RULE 4-3, CERTIFICATION (c)(ii) does likewise: "The signing appraiser must have no reason to doubt that the work of those individuals is credible. Comment: Although a certification must contain the names of individuals providing significant appraisal or appraisal review assistance, it is not required that a summary of the extent of their assistance be located in a certification. This disclosure may be in any part(s) of the report." (Emphasis Added)

26. In underwriting the Loan, in addition to requiring a loan to purchase price ratio ("LTPP") the Lender required an accurate appraisal to determine, inter alia, the loan-to-value ratio ("LTV") based on the average retail value ("ARV").

27. The ARV was determined by an appraisal of the Property ("Appraisal") performed by the Appraiser Defendants.

28. Using an LTV allowed the Lender to create a buffer of equity in the property securing each Loan to protect Lender's investment because, if the Borrowers failed to make any payments against the Loan, Lender could foreclose on the Property and recover the full amount of Loan plus the costs of foreclosure.

29. The risk that the Appraisal was intended to protect against was not the possibility of Borrower's default on the Loan; rather, the Appraisal was intended to ensure that if there was a default, that the mortgagee would be secured adequately.

30. It was the obligation of the Defendants, as professional Appraisers, to conduct honest and accurate appraisals, including the Appraisal, in full conformity with

USPAP and The Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

31.     Appraiser 1 was, at all times relevant hereto, licensed to perform real estate appraisals in the State of Texas as a Certified General Appraiser under Texas License No. 1380938 and in New York as a Certified General Appraiser under New York License 46000049921 and as a professional under New York law.

32.     Appraiser 2 was, at all times relevant hereto, licensed to perform real estate appraisals in the State of Texas as a Certified General Appraiser under Texas License No. 1381201, and in New York as a Certified General Appraiser under New York License 46000053177 and as a professional under New York law.

33.     Lender employed Appraiser Defendants for the limited and express purpose of obtaining an appraisal of the Property in compliance with The Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute and USPAP.

34.     The Appraiser Defendants conducted the Appraisal of the Property on or about February 3, 2022, finding an As Complete/As Stabilized value as of July 24, 2023, of $23,700,000 and an As Is value as of January 24, 2022, of $18,400,000.

35.     The Appraiser Defendants presented the Appraisal to the Lender, who was identified on the face of the Appraisal as the addressee and Client (*lender/client*, as defined in USPAP).

36.     The Appraisal certified ("Certification") that it conformed with the following:

> Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standard of Professional Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice, and applicable state appraisal regulations.

37.     The Appraisal contained the Appraiser Defendants' individual license numbers.

38.     The Lender funded the Loan in direct reliance on the values presented in the Appraisal.

39.     A subsequent retroactive Appraisal Field Review Report ("Expert Report," attached hereto as Exhibit "1," and incorporated by reference) identified errors, most of which are, *inter alia,* gross negligence as reflected in violations of USPAP, and causing the Appraisal to be inflated.

40.     Overall, there are enough deficiencies in the original appraisal report to conclude the appraisal results are not credible. The Expert Report summarized the Appraiser's negligence as follows:

> Overall, the appraisal report demonstrates gross negligence exemplified by a severe level of carelessness and disregard for professional appraisal standards in valuing the subject property. The lack of competency ultimately resulted in an inaccurate appraisal, due to blatant errors or a complete lack of due diligence.

41.     The Appraisal was so bad that the Appraiser Defendants' agent only inspected one building out of the forty buildings that made up the development being appraised!

42. The Expert Report found that for the As Is value:

> The original appraisal report states the "as is" market value conclusion is $18,400,000. The review appraiser's opinion of the retrospective "as is" market value of the subject, as of January 24, 2022, is $5,834,600. **This represents a value differential of $12,565,400 from the original appraisal report.** (emphasis added)

43. The Expert Report found that for the As Stabilized value:

> The original appraisal reports the "as stabilized" market value conclusion to be $23,700,000. The review appraiser's opinion of the retrospective "as stabilized" market value of the subject, as of January 24, 2022, is $9,092,000. **This represents a value differential of $14,608,000 from the original appraisal report.** (emphasis added)

44. The Loan was based on both the As Is and As Stabilized values as stated in the Appraiser Defendants' Appraisal.

45. The Plaintiff would not have made the Loan had it known the correct As Is or As Stabilized values of the Property.

## BREACHES BY THE TITLE COMPANY AND TITLE ATTORNEY DEFENDANTS:

46. The Title Company and Title Attorney were hired by the Lender to close the Loan and sale of the Property from Sabine Holdings, LLC to Sabine Portfolio LLC ("B to C Sale").

47. Unbeknownst to the Lender, the Title Company and Title Attorney were also hired by Sabine Portfolio LLC to close Sabine Portfolio LLC's purchase of the Property from CAF 2019-3 Ryer 6 TX, LLC ("A to B Sale").

48. The Title Company and Title Attorney knew that the Property was to be flipped from CAF 2019-3 Ryer 6 TX, LLC through Sabine Portfolio LLC to Sabine Holdings, LLC ("Flip").

49.     Upon information and belief, the Title Company and Title Attorney performed a title search of the Property and knew that the Property was to be Flipped.

50.     On November 22, 2021, the Title Company and Title Attorney issued a Commitment for Title Insurance (FORM T-7) ("Commitment") as Authorized Officer or Agent for Fidelity National Title identified as RANTL-43022A.

51.     On February 23, 2022, the Title Company and Title Attorney issued a Loan Policy of Title Insurance (T-2) Policy No.: 128171-1-RANTL-43022A-2022.2744343-226914215 ("Title Policy") as Authorized Officer or Agent for Fidelity National Title Insurance Company, for which they were paid $81,445.00.

52.     The Title Company and Title Attorney never disclosed the true nature of the A to B Sale as it related to the B to C Sale -that of a Flip.

53.     Upon information and belief, the Title Company and Title Attorney used different Settlement Statements to close the A to B Sale.

54.     Upon information and belief, the Title Company and Title Attorney hid the A to B Sale Settlement Statement from the Lender.

55.     Upon information and belief, the Title Company and Title Attorney improperly filled out the B to C Sale Settlement Statement in that they, inter alia, failed to identify that significant Loan proceeds would be transferred from the B to C Sale to fund the A to B Sale and failed to identify that Loan proceeds were being used to pay off the lien held by CAF 2019-3 Ryer 6 TX, LLC.

56.     The Title Company closed the Loan on February 9, 2022.

57.     Upon information and belief, the Title Company and Title Attorney closed the B to C Sale before the A to B Sale – this means that B sold the Property before it owned the Property.

58.     Upon information and belief, the Title Company and Title Attorney used the Lender's funds to fund the A to B Sale, thereby closing the A to B Sale without Good Funds as defined in See–Texas Department of Insurance ("TDI") Basic Manual of Title Insurance, Section IV, Procedural Rule P-27(A.)(1.).

59.     This information and belief is based, in part, upon the fact that the A to B Sale deed is dated January 18, 2022 from CAF 2019-3 RYER 6 ("A") to SABINE HOLDINGS LLC ("B").  It is effectively dated February 9, 2022 (the B to C Sale closing date) but not recorded until February 23, 2022.  The B to C Sale deed is dated February 2, 2022 (not the sale date of February 9, 2022) from B to Sabine Portfolio LLC ("C").  This deed was also recorded on February 23, 2022 (simultaneously with the A to B Deed). The A to B Sale deed should have been recorded well before the B to C Sale took place had "Good Funds" been used and should not have been effectively dated the date of the B to C Sale date.

60.     Upon information and belief, the Flip violated Fidelity Title Insurance Company's policies and procedures.

61.     Upon information and belief, the Flip violated the Title Company's policies and procedures.

62.     The Flip violated Texas Insurance Code § 2651.202 and TDI Procedural Rule P-27(A.)(1.).

63.     Lender relied on the Title Company and Title Attorney to protect its interests regarding the Loan.

64.     Lender would not have funded the Loan had it known the true nature of the Flip.

65.     By virtue of having closed the B to C Sale the Title Company and Title Attorney performed the following acts ("Bad Acts") and/or allowed the following scenarios to occur:

- Failing to properly disclose the Flip nature of B to C Sale to the Lender;
- Failing to properly disclose the Flip nature of B to C Sale to the Lender's counsel;
- Creating a settlement statement with material inaccurate information;
- Overseeing execution of the B to C Sale settlement statement without disclosing that it was materially inaccurate;
- Failing to reflect the CAF 2019-3 Ryer 6 TX, LLC payment of lien on the settlement statement;
- Violating TDI P-27 by allowing the B to C Sale to proceed without Good Funds;
- Otherwise facilitating the consummation of the Flip and/or
- Failing to follow Lender instructions or inform Lender or its counsel of any of the above.

**AS AND FOR A FIRST CAUSE OF ACTION**
**PROFESSIONAL MALPRACTICE**
(Against Appraiser Defendants)

66.     Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-65 of this Complaint, as if stated herein at length.

67. Appraiser 1 *personally* performed the Appraisal in her individual capacity as a duly licensed appraiser in New York and Texas.

68. Appraiser 2 *personally* performed the Appraisal in his individual capacity as a duly licensed Certified General Real Estate Appraiser in New York and Texas.

69. Appraiser Defendants were corporate officers (if a corporate entity exists) who participated in the commission of a tort in furtherance of the corporation's business (if a corporate entity exists) and may be held individually liable, regardless of whether he acted on behalf of the corporation (if a corporate entity exists) in the course of official duties and regardless of whether the corporate veil is pierced.

70. A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, including appraisers, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, which gives rise to a duty of due care.

71. The legal duty owed by the Appraiser Defendants to the Lender (and thus to the Plaintiff as Lenders' successor in interest) arises from the Appraiser Defendants' professional relationship with the Lender; their duty included, but was not limited to, complying with USPAP.

72. The Appraiser Defendants owed the Plaintiff this duty, as the assignee of the Loan secured by the Property.

73. Appraiser Defendants, in their professional capacity, owed Lender a duty to conform to a certain standard of conduct and prepare each Appraisal using that degree of care and skill which a reasonably competent appraiser acting in similar circumstances

would use in preparing an appraisal; this duty included, but was not limited to, complying with USPAP.

74.     The applicability of USPAP is specifically identified in the Certification.

75.     The Plaintiff has privity of contract, or its equivalence, with the Appraiser Defendants insofar as there is an intimate nexus between the Plaintiff and the Appraiser Defendants as the Plaintiff hired the Appraiser Defendants to perform the Appraisal.

76.     Appraiser Defendants knew that the express purpose of the Appraisals was for Lender to use said Appraisals in determining whether or not to make a loan in order to ensure that the mortgagee would be secured adequately in the event of a default.

77.     The Appraiser Defendants are appraisers with special training and experience.  As professionals, who under New York law, must adhere to a standard of conduct commensurate with such attributes, the Appraiser Defendants owed the Lender a duty to prepare the Appraisal using that degree of care and skill which is reasonable under the circumstances – that which a reasonably competent appraiser acting in similar circumstances would use in preparing an appraisal of the Property.

78.     Appraiser Defendants, by and through the Appraisal, violated USPAP the uniform standard of conduct required of them as Appraisers by failing to use reasonable care under the circumstances, in the case of an appraiser - in reaching a value conclusion for the relevant Property that was inappropriate, unreliable, and grossly overstated.

79.     The legal duty owed by the Appraiser Defendants to the Lender arises from the Appraiser Defendants' professional relationship with the Lender.

80.     The Appraiser Defendants also owed the Plaintiff this duty to the mortgagee of the Loan secured by the Property.

81.     The Appraiser Defendants breached this duty and violated USPAP by and through their gross negligence, acts and/or omissions.

82.     The duty owed to the Plaintiff included, but was not limited to, the obligation to provide an appraisal of the Property to ensure that the Loan was properly secured in case of a default.

83.     When the Appraiser Defendants issued their negligent Appraisal, it was foreseeable that the Property would be overvalued, causing the Loan to be under-secured, and that in case of a default, the Plaintiff (as a mortgagee and assignee) would suffer loss stemming from that Loan.

84.     The Lender reasonably relied on the Appraisals to determine the value of the Property.

85.     The Property's value was overstated as a direct result of the gross negligence, acts and omissions of the Appraiser Defendants.

86.     But for the Appraiser Defendants' gross violation of their professional obligations, the Lender would not have approved and funded the Loan for the amounts loaned and would not have been damaged.

87.     The damages to Plaintiff are an actual injury to the Plaintiff caused by the Appraiser Defendants.

88.     The Plaintiff's damages were proximately caused by the Appraiser Defendants' failure to use that degree of care and skill that a reasonably competent appraiser would have used in preparing an appraisal of the Property because after default, the Plaintiff was not secured adequately as the Property values were significantly less than as relied upon.

89. Appraiser Defendants' actions were misfeasance (or defective performance) as a matter of tort because the Appraiser Defendants defectively performed the Appraisals.

90. The Plaintiff's damages were an abrupt, cataclysmic occurrence – the value of the Plaintiff's collateral reduced cataclysmically*;* the harm was not simply the replacement cost of the Appraisal, which was duly paid, so the Plaintiff may not be deemed to essentially seek enforcement of the bargain.

91. As a direct result of Appraiser Defendants' gross professional malpractice, Plaintiff has been damaged.

### AS AND FOR A SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
(Against Title Company)

92. Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-91 of this Complaint, as if stated herein at length.

93. The Title Company and Title Attorney issued the Title Policy as an agent of Fidelity Title Insurance Company. This policy states that "the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured, and in Interpreting and enforcing the terms of this policy." It is undisputed that the Land covered by the insurance policy is located in Texas at 111 West Pine Avenue, Orange County, Texas 77630. As such, with respect to claims made against the Title Company and Title Attorney, Texas law should apply.

94. As evidenced by a letter, dated February 9, 2022, from Lender's attorney, Jonathan L. Hornick, to Title Company, a valid contract existed between Lender and Title

Company ("TC Contract").  This contract extended to Lender's successors or assigns, including Plaintiff.

95.     Pursuant to the TC Contract, the Title Company "represents and warrants to Lender and to Lender's Counsel that all title matters and information have been checked by Agent prior to the execution of this closing instructions letter (and will be checked by you prior to the time of recording and/or filing, as applicable, of the Loan Documents for recordation as instructed herein), that all prior Deed of Trusts, deeds of trust, liens and other title exceptions, including all taxes due and payable as of date hereof, other than the Permitted Encumbrances, have been properly released or terminated of record in the appropriate real property records wherein the Property is located and that the Lender's Policy has been authorized by the Underwriter, and written and issued exactly as required hereby with no additional exceptions (regardless of rank or priority) in the Lender's Policy."

96.      In reliance on the Title Company's representations at closing, Lender tendered performance of the TC Contract by paying the Title Company $81,445.00.

97.     The Title Company breached the TC Contract by, inter alia, performing the Bad Acts, failing to perform or tender performance as contractually required, by allowing the B to C Sale to take place without Good Funds, failing to disclose the A to B Sale, allowing the Flip, and failing to comply with the Fidelity Title Insurance Company's policies and procedures, the Title Company's policies and procedure, and Texas Insurance Code §2651.202 and TDI Procedural Rule P-27(A.)(1.).

98.     But for the direct and proximate cause of the TC Contract breaches, Plaintiff would not have made the Loan, and would not have suffered any damages as noted above.

**AS AND FOR A THIRD CAUSE OF ACTION**
<u>**NEGLIGENCE**</u>
(Against Title Company and Title Attorney)

99.     Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-98 of this Complaint, as if stated herein at length.

100.    As Lender's escrow agent, the Title Company and Title Attorney, per Texas Law, owed the Lender (and Plaintiff as assignee) the duties of loyalty, full disclosure, and the requirement to exercise a high degree of care in conserving the funds placed in escrow, as well as to carry out the terms of the escrow agreement.[i]

101.    The Title Company and Title Attorney breached their duties to Plaintiff by performing the Bad Acts, failing to perform or tender performance as contractually required, by allowing the B to C Sale to take place without Good Funds, failing to disclose the A to B Sale, allowing the Flip, and failing to comply with the Fidelity Title Insurance Company's policies and procedures, the Title Company's policies and procedure, and Texas Insurance Code §2651.202 and TDI Procedural Rule P-27(A.)(1.).

---

[i] *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664-65 (Tex. 1969); *see also Holder-McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas 2006, pet. denied); *see also Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 731-34 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Jones v. Blume*, 196 S.W.3d 440, 448 (Tex. App.—Dallas 2006, pet. denied); *Chapman Children's Trust v. Porter & Hedges, LLP*, 32 S.W.3d 429, 438 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

102.    But for the direct and proximate cause of the Title Company and Title Attorney's negligence, Plaintiff would not have made the Loan, and would not have suffered any damages as noted above.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**<u>NEGLIGENT MISREPRESENTATION</u>**
(Against Title Company and Title Attorney)

103.    Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-102 of this Complaint, as if stated herein at length.

104.    Upon information and belief, the Title Company and Title Attorney made false statements and/or misrepresentations to the Lender at or around the time of the sale of the Property.

105.    The Title Company and Title Attorney did not exercise reasonable care or competence in obtaining or communicating the information.

106.    But for the false statements and/or misrepresentations, Plaintiff would not have made the Loan, and would not have suffered any damages as noted above.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**<u>BREACH OF FIDUCIARY DUTY</u>**
(Against Title Company and Title Attorney)

107.    Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-106 of this Complaint, as if stated herein at length.

108.    As Lender's escrow agent, the Title Company and Title Attorney owed Lender, and Plaintiff as assignee, fiduciary duties of loyalty, full disclosure, and the

requirement to exercise a high degree of care in conserving the funds placed in escrow, as well as to carry out the terms of the escrow agreement.[ii]

109.    The Title Company and Title Attorney breached their duties by performing each Bad Act.

110.    As Lender's escrow agent, the Title Company and Title Attorney also acted as trustees on behalf of Lender, making their bad acts also violations of Section 114.001, et. seq. of the Texas Trust Code. Accordingly, the Lender is entitled to derivative actual damages pursuant to Texas Trust Code Section 114.001, and attorney's fees pursuant to Texas Trust Code Section 114.064.

111.    But for the Title Company and Title Attorney's breaches of their duties to Plaintiff, Plaintiff would not have made the Loan, and would not have suffered any damages as noted above.

### AS AND FOR A SIXTH CAUSE OF ACTION
### CONSPIRACY TO COMMIT MORTGAGE FRAUD
(Against Title Company and Title Attorney)

112.    Plaintiff repeats, reiterates, realleges and incorporates by reference the allegations contained in paragraphs 1-111 of this Complaint, as if stated herein at length.

113.    Upon information and belief, Title Company, and Title Attorney in combination with Abraham Wieder and Sabine Portfolio LLC, conspired to induce Plaintiff

---

[ii] *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664-65 (Tex. 1969); *see also Holder-McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas 2006, pet. denied); *see also Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 731-34 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Jones v. Blume*, 196 S.W.3d 440, 448 (Tex. App.—Dallas 2006, pet. denied); *Chapman Children's Trust v. Porter & Hedges, LLP*, 32 S.W.3d 429, 438 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

to make a loan based on false pretenses, in order to defraud Plaintiff and collect unearned fees and hidden profits.

114.     Defendants knew that the agreed acts would result in harm to Plaintiff.

115.     To accomplish the object of their agreement, Defendants intentionally and knowingly took part in numerous acts indicative of a fraudulent mortgage transaction, including but not limited to the Title Company and Title Attorney's Bad Acts.

116.     These acts, both singularly and collectively, constitute mortgage fraud in violation of Tex. Pen. Code § 32.32(b), and 18.U.S.C. § 1014.

117.     But for the fraudulent actions taken by the Defendants, Plaintiff would not have made the Loan, and would not have suffered any damages as noted above.

WHEREFORE, Plaintiff seeks judgment,

a.     On its first cause of action, against the Appraiser Defendants, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements;

b.     On its second cause of action, against the Title Company, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements;

c.     On its third cause of action, against the Title Company and Title Attorney, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements;

d.     On its fourth cause of action, against the Title Company and Title Attorney, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements;

e.     On its fifth cause of action, against the Title Company and Title Attorney, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements;

f.      On its sixth cause of action, against the Title Company and Title Attorney, jointly and severally, in the amount of $9,423,384.84, including pre- and post-judgment interest, costs and disbursements; and

g.      granting such other and further relief in favor of Plaintiff, as justice in this case may require.

Dated:  New York, New York
         February 6, 2025

                                        Yours, etc.,

                                        NEUFELD, O'LEARY & GIUSTO

                                        By: _Michael J. Giusto_____
                                        Michael J. Giusto, Esq.
                                        Attorneys for Plaintiff
                                        60 East 42nd Street, Suite 4600
                                        New York, New York  10165
                                        (212) 986-0999
                                        mgiusto@noglaw.com

                                               -and-

                                        William M. Rudow, Esq.
                                        Awaiting Admission – *Pro Hac Vice*
                                        PIEL LAW FIRM, LLC
                                        Co-Counsel for Plaintiff
                                        502 Washington Avenue, Suite 730
                                        Baltimore, Maryland 21204-4525
                                        Tel.: (410) 542-6000
                                        Fax: (410) 849-4889
                                        WRudow@PielLawFirm.com