
## Retrospective Desk Review

### Section 1.0 - Introduction

| | | |
|---|---|---|
| 1.1 | Subject Property Address | 111 W Pine Avenue, Orange, Orange County, TX. 77630 |
| 1.2 | Prepared By | Andrea M. Fahrenthold, MAI; Steven S. Albert, MAI, SRA |
| 1.3 | Appraiser License Number | 1320492-G; CG 553.000219 |
| 1.4 | Prepared For | Piel Law Firm, 502 Washington Avenue, Ste. 730, Townson, MD 21204 |
| 1.5 | Intended User | Hunter C. Piel, Attorney at Law |
| 1.6 | Intended Use | Potential litigation |
| 1.7 | Date of Report | 8/9/2024 |

### Section 2.0 - Original Appraisal Report

| | | |
|---|---|---|
| 2.1 | Property Type | 200-Unit Multi-Family/Apartments - Sabine Park Apartments |
| 2.2 | Prepared By | Bowery Valuation: Michelle Zell, MAI – Lilly Howes – Ross Wigon |
| 2.3 | Prepared For | Pacific Private Money, Inc. |
| 2.4 | Effective Date of Value | 1/24/2022 |
| 2.5 | Date of Signature/Report | 2/3/2022 |
| 2.6 | Opinion of Value | As-Is: $18,400,000  -  As-Stabilized: $23,700,000 |

### Section 3.0 - Review Summary

| | |
|---|---|
| 3.1   Value Difference | **AS IS CONCLUSION**<br><br>The original appraisal report states the "as is" market value conclusion is **$18,400,000**.<br><br>The review appraiser's opinion of the retrospective "as is" market value of the subject, as of January 24, 2022, is **$5,834,600**.<br><br>This represents a value differential of **$12,565,400** from the original appraisal report.<br><br>The reviewer appraiser's conclusion of the "as-is" market value of the subject property is based on the extraordinary assumption that the occupancy rate was 30%, as of the effective date of appraisal. It is not possible to confirm the subject's occupancy since there was no onsite management on the date of inspection (08/05/2024).<br><br>Further, no historic operating data was provided in the original appraisal to corroborate this assumption, and my conclusion of the occupancy being 30% is predicated on the original appraisal reporting of a 30% occupancy.<br><br>The original appraisal report states the property was in need of renovation in the amount of $2 million. There is no supporting documentation for this figure.<br><br>Based on the in-person inspection on August 5, 2024, and conversations with current tenants, City officials in Orange, and other research, it is concluded the subject was in need of significant renovation – far greater than the estimate of $2,000,000. However, with no other data to rely on, and in light of the fact that 82 units have already been razed, for purposes of analysis, we rely on the extraordinary assumption that $2 million is accurate.<br><br>**AS-STABILIZED CONCLUSION**<br><br>The original appraisal reports the "as stabilized" market value conclusion to be **$23,700,000**.<br><br>The review appraiser's opinion of the retrospective "as stabilized" market value of the subject, as of January 24, 2022, is **$9,092,000.**<br><br>This represents a value differential of **$14,608,000** from the original appraisal report.<br><br>The reviewer's as-stabilized market value conclusion is based on the fact the subject is rent controlled, as per the agreement filed of record with the Texas Department of Housing and Community Affairs (TDHCA). The subject property is under a Land Use Restriction Agreement (LURA) with TDHCA. The implications from this Agreement indicate the property is rent-controlled for the term of the Agreement.<br><br>One of the contributing factors explaining the difference between the original appraisal and the review appraiser's conclusions is the fact the original appraisal did not take into account the potential gross income must consider honoring the LURA for the current tenants. In addition, the original appraisal reflects market rental rates about 40% higher than the actual market rental rates in Orange for this type of property.<br><br>The review appraiser's opinion of the retrospective "as stabilized" market value of the subject is predicated on the hypothetical condition the improvements are structurally sound. In addition, this value conclusion assumes the extraordinary assumption the improvements could sustain being lifted at least one foot (1') in order to comply with the FEMA requirements of the Base Flood Elevation (BFE). |

| | |
|---|---|
| | A survey of the BFE is recommended for the property, and an inspection by a qualified building inspector is recommended to determine the structural integrity of each of the remaining buildings. The findings from these two studies will determine whether the improvements should be razed, or if they could sustain a complete renovation.<br><br>A deed-in-lieu of foreclosure was filed 09/23/2021.<br><br>TDHCA subsequently filed the Termination of the LURA 02/23/2022 – about one month after the effective date of the original appraisal.<br><br>Although the LURA was terminated, *the property remains subject to monitoring for compliance with Section 5c of the TDHCA LURA until 01/25/2025*. Thus, the property remains subject to rent controls.<br><br>SR 1-1(a) requires an appraiser to "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal." Using only market rent – and, not the analyze the potential gross income based on the restricted rent, results in an inflated value for both the "as-is" and "as-stabilized" conclusions.<br><br>SR 2-1(a) requires each written appraisal report to "clearly and accurately set forth the appraisal in a manner that will not be misleading." Omitting any analysis, contractor name, details, or the scope of work for the renovations fails to employ recognized methods and techniques from peers that leads to credible results.<br><br>Overall, the appraisal report demonstrates gross negligence exemplified by a severe level of carelessness and disregard for professional appraisal standards in valuing the subject property. The lack of competency ultimately resulted in an inaccurate appraisal, due to blatant errors or a complete lack of due diligence. |
| 3.2   Purpose | The purpose stated in the original appraisal report is *"to provide an opinion of As Is Market Value of the Fee Simple Interest as of January 24, 2022, and the Prospective Market Value Upon Completion/Stabilization of the Leased Fee Interest as of July 24, 2023."*<br><br>The interest appraised is changed throughout the report – from fee simple to leased fee.<br><br>The purpose of this appraisal review is to communicate an opinion of the appropriateness of the analyses, credibility of the assignment results, and compliance with the applicable edition of the Uniform Standards of Professional Appraisal Practice (USPAP).<br><br>If the report is not credible, the client requests the reviewer to develop an independent opinion of market value, if possible.<br><br>The data, analyses, and conclusions in the original appraisal report are not reliable or credible; therefore, the reviewer developed an independent opinion of the "as is" and "as stabilized" market value based on certain extraordinary assumptions and hypothetical conditions. |

| 3.3 | Scope of Work | The scope of work for this assignment is to perform a USPAP-compliant Standard 3 and Standard 4 review of the appraisal prepared for Pacific Private Money, Inc. |
| --- | --- | --- |
| | | Based on research and verification of the sales, rent comparables, income, and expenses in the original appraisal report, the review appraiser has formed an opinion as to the overall credibility of the report. |
| | | The conclusions presented herein support the rationale of the review appraiser's independent opinion of the "as-is" and "as stabilized" market value, predicated on certain extraordinary assumptions and hypothetical conditions identified in this report. |
| | | The review appraiser (Andrea Fahrenthold) personally viewed the subject property on August 5, 2024. The exterior of each building was inspected, and the interior of 10 units were inspected. |
| | | The review appraiser did not personally inspect the comparable sales or rentals identified in the original appraisal report. |
| | | The review appraiser verified portions of the factual data in the original appraisal report. All of the comparable sales and rentals were researched. |
| | | The expense comparables were not researched or confirmed since there was no identifying information provided to authenticate the existence of the expense comps. |
| 3.4 | Extraordinary Assumptions | Unless stated to the contrary, this appraisal review is predicated on the extraordinary assumption that factual data presented in the original appraisal report is accurate. If the original appraisal report presents contradictory information, the inconsistencies are stated in this review if there is a material impact on the credibility of the results and value conclusions. |
| | | If any factual data stated in the original appraisal report was found to be false, the effect on the reviewer's opinions and conclusions is so stated. |
| | | There were three (3) extraordinary assumptions stated in the original appraisal report. Two of these assumptions are conflicting. |
| | | The *first* extraordinary assumption states the renovation will be completed as of January 24, 2023, and "*in accordance with the local planning authority's zoning codes and building department's construction codes*." |
| | | Because there is no written description of the work to be performed, no plans and specs (drawings), costs, or descriptions, the intended user has no way to reasonably ascertain whether the proposed project would comply with the City of Orange's municipal ordinances. |
| | | The *second* extraordinary assumption states the prospective purchaser will complete the renovations in "*an estimated time frame of 18 months*." |
| | | With no details of the work to be performed, there is no way to conclude if 18 months is a reasonable amount of time for completion. Notably, this extraordinary assumption conflicts with the first extraordinary assumption that states the work will be completed in 12 months (by January 24, 2023). |
| | | The third extraordinary assumption in the original appraisal report is inconsequential to the review, as it relates to a caveat regarding the economy. |
| | | Appraisers should ensure that when extraordinary assumptions are warranted to develop a credible analysis, requisite support is provided to the intended user. |



| | | |
|---|---|---|
| 3.5 | Hypothetical Conditions | There are no hypothetical conditions stated in the original appraisal report. |
| | | This appraisal review includes the following hypothetical conditions: |
| | | The improvements are structurally sound, and can sustain being lifted at least 1' off the ground to comply with the FEMA requirements of the Base Flood Elevation (BFE). |
| | | When meeting with officials of the city of Orange, the Building Inspector, Marvin Benoit, expressed doubt and concern over the buildings' structural soundness. This opinion was based on his site visit on multiple occasions, both during, and after, 40% of the buildings were razed in mid-2023 and early-2024. |

| |
|---|
| **Section 4.0 - Review of the Original Appraisal Report** |
| **4.1  Are the analyses, opinions and conclusions in the Area Analysis section credible?** |
|     **Conclusion:** Yes |
|     **Comments:**  None |
| **4.2  Are the analyses, opinions and conclusions in the Property History section credible?** |


**Conclusion:** No

**Comments:** USPAP Standard 1-5(b) requires an appraiser to analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal. The appraisal report did not meet this requirement.

Page 1 of the appraisal states the subject sold 08/12/21.

The report states the property sold for "a confidential price."

No recording data was provided for this transaction.

The appraisal report states the grantor is Bodin Properties, LLC, and the grantee is CAF 2019-3 Ryer 6 TX LLC. The document filed states that CAF 2019-3 Ryer 6 TX LLC is a nominee of the lender and is taking title to the property.

The reviewer found that CAF 2019-3 Ryer 6 TX LLC is an entity created January 25, 2021, and a tax forfeiture was filed by the Texas Secretary of State on March 10, 2023.

The review appraiser found no transactions on 08/12/21 between these two parties; however, a deed-in-lieu was filed on 09/23/21 involving the two parties.

The review appraiser found the following document recordings within the three years prior to the effective date of the appraisal:

Date:  April 8, 2019
Grantor:  Texas Bay Bluff, LLC
Grantee:  Bodin Properties, LLC
Document:  Special Warranty Deed with Vendor's Lien
Recording Data:  OCDR 472748

Date:  April 8, 2019
Borrower:  Bodin Properties, LLC
Lender:  First Federal Bank of Louisiana
Document:  Special Warranty Deed with Vendor's Lien
Loan Amount:  **$3,160,000**
Recording Data:  OCDR 472749

Date:  October 10, 2019
Grantor:  Bodin Properties, LLC
Grantee:  Ryer Investors 6, LLC
Document:  Special Warranty Deed with Vendor's Lien
Recording Data:  OCDR 479951
Remarks:  This appears to be an internal transaction since Bodin Properties, LLC and Ryer Investors 6, LLC share this address. Ryan Bodin is named in the Texas Secretary of State corporate entity filings for both organizations.

Date:  October 10, 2019
Borrower:  Ryer Investors 6, LLC
Lender:  Corevest American Finance Lender LLC
Document:  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
Loan Amount:  **$9,205,000**
Recording Data:  OCDR 479552

Date:  February 26, 2021
Assignor:  Corevest American Finance Lender LLC
Assignee:  CF Corevest Purchaser, LLC
Document:  Assignment of Deed of Trust
Recording Data:  OCDR 199153
Original Loan Amount:  **$9,205,000**
Remarks:  This Deed of Trust reportedly involves three (3) properties, two of which are located in Louisiana.

Date:  September 23, 2021
Grantor:  Ryer Investors 6, LLC
Grantee:  CAF 2019-3 Ryer 6 TX LLC
Document:  Warranty Deed
Recording Data:  OCDR 508927
Remarks:   The deed states the transaction is a deed-in-lieu of Foreclosure Agreement by and among Ryer Investors 6, LLC, Wilmington Trust, National Association, as Trustee, for the benefit of Corevest American Finance 2019-3 Trust Mortgage Pass-through certificates Corevest American Finance Lender LLC.

Date:  September 23, 2021
Document filed:  Declaration Terminating Declaration of Land use Restrictive Covenants
Recording Data:  OCDR 508928
Remarks:  This document was filed with the intention of terminating the Land Use Restriction Agreement (LURA) between the property owner of the subject and Texas Department of Housing and Community Affairs (TDHCA), but was declared void by TDHCA in a document filed of record on 02/23/22.

The LURA is a restriction on land use, and impacts the subject property's market value.

The appraisal report does not address this fact.

As of the effective date of the appraisal, the appraisal states there was a reported contract on the property; however, the parties involved in the transaction were not disclosed. The sales price was reportedly **$16,500,000**, but no documentation was provided to corroborate the contract price (i.e. executed sales agreement). The report states this was *not* an open market transaction – meaning the sales price was agreed on without the property being exposed on the open market.

Omitting details of a property's transaction history does not comply with SR 1-5(b) and SR 2-1(a) and (b).

**4.3**  **Are the analyses, opinions and conclusions in the Site Description section credible?**

**Conclusion:** No

**Comments:**  While the Site Description section in the original appraisal report provides current narrative on the recent changes to the neighborhood's designation in Zone AE of the 100-year flood plain, it does not address the impact of the federal guideline issued by Federal Emergency Management Agency (FEMA), effective 12/16/21.

According to Marvin Benoit, Building Official for the City of Orange, *any* renovation to the improvements would require a building inspection and permit. As of 12/16/21, FEMA issued new flood plain maps that increased the Base Flood Elevations (BFE) for properties in the city of Orange.

Sabine Park Apartments would need to be raised about 1' – or more – depending on the current elevation of each individual building.

Federal regulations (CFR 44, Section 59 and 60) specify that when the cost of a structure's repair exceeds 50% of the current value of the structure, it must be repaired in compliance with the <u>most current</u> City Ordinance Code, including elevation requirements for properties in the 100-year flood plain.

Mr. Benoit stated that, given the condition of the structures in January 2022, there is uncertainty as to whether a permit would be granted. Orange City officials stated they visited the property after complaints from residents were made about the condition of the property. The results of the onsite January 2023 inspection revealed deferred maintenance that had likely been the result of years of neglect of the property.

This conclusion is corroborated by former residents, as well as from minutes of a board meeting between a prior owner of the property and TDCHA in July 2013 – and, this requirement, alone, could likely call for the improvements to be razed if they are not structurally sound.

**4.4**  **Are the analyses, opinions and conclusions in the Improvements section credible?**

**Conclusion:** No

**Comments:**


Orange County Appraisal district website reflects the improvements were reportedly constructed in 1945.

The subject was inspected on January 24, 2022 by Donna Breuer, a third-party inspector. The report states six (6) units were inspected.

Given the known condition of the property, a more thorough inspection should have been performed, on both the interior and exterior of the property.

Page 10 of the appraisal report states the units inspected were vacant, and "*none of the inspected units are ready for occupancy as the owner is vacating all units to be renovated.*"

Of the 11 interior photographs presented in the Addenda of the report, only 3 pictures are of vacant units. The remaining photographs are of the occupied manager's unit, which was in Section 3. The photographs of the inspected units do not identify any specific problems that preclude any of the units from being leasable.

Section 3 is part of a group of buildings razed by the City in early-2024.

Page 11 of the Description of Improvements states the foundation is poured concrete. The foundation for the entry steps is concrete. The individual structures are not concrete. They are on concrete blocks, and are pier and beam.

Page 12 states the Heating/Cooling is steam heating. It is not steam heating. It is forced air.

Page 12 states there is no parking space on the property. There is a parking lot identified on the appraisal district map and aerial map. In addition, Orange city officials provided a building layout map depicting the parking area. The reviewer parked in the parking lot during the onsite inspection.

Under the subsection identifying unit finishes, the appraisers draw conclusions as to the quality of the kitchen, bathroom, bedroom, and living area, upon completion of the renovation. The report states the units will feature "*good quality*" finishes for the entire apartment; however, there is no supporting evidence for this assumption. There are no drawings, plans and specs, or any written description in the body or addenda of the report.

Page 13 of the appraisal report states the property is in average condition, but given the 70% vacancy on the effective date of appraisal, a 3% unit inspection rate is concluded to be unreasonable. When a property is imbalanced with its occupancy, it is prudent to inspect a larger percentage of vacant units to ensure the condition is homogeneous. Discussions with former residents and research of the property reveals Sabine Park Apartments has a long history of unaddressed deferred maintenance.

During the review appraiser's onsite inspection and investigation, several squatters reported being former tenants, and all stated the property had experienced deferred maintenance for years. This is corroborated through conversations with several tenants who lived on the property prior to being forced out in 2023 and 2024. In addition, City officials stated they were aware of the rotting wood underneath the cement board siding. Marvin Benoit, Building Official for the City of Orange, stated he observed the exterior condition of the property prior to demolishing 82 units of the 200 units between 2023 and 2024.

SR 1-2(e)(5) states when appraising proposed improvements, an appraiser must examine and have available for future examination, plans, specifications, or other documentation sufficient to identify the extent and character of the proposed improvements.

This Standard was not adhered to in the original appraisal report.

This missing and/or incomplete analysis reflects non-compliance with SR 1-1(a); 1-1(b); 1-2(e)(i); 1-4(a); 2-1(a); 2-1(b); 2-2(a)(viii).

| | |
|---|---|
| 4.5 | Are the analyses, opinions and conclusions in the Highest & Best Use section credible? |


**Conclusion:** No

**Comments:** Page 18 of the report presents a discussion of the Highest and Best Use, As Vacant, and As Improved. Under the subheading As Vacant – Legally Permissible, there is no mention of the site being restricted to multi-family residential development that is subject to a Land Use Restriction Agreement (LURA) issued by the TDHCA. The land use, as vacant, is restricted to affordable housing and multi-family development.

Under the As Vacant – Financially Feasible subsection, the report states the subject is located in an area "*exhibiting low vacancy rates and increasing rental rates*," yet no history of the subject's vacancy/rental rates is provided – nor is any data of historical trends of the comparable rentals provided. Only three rentals from Orange are included in the report. The remaining rentals are in different cities, and no historical trends are provided for these properties.

It is appropriate to evaluate competing properties subject to rent control under a LURA, similar to the subject.

Moreover, this assertion is contrary to the 30% current occupancy for the subject stated throughout the report. There cannot be low vacancy and increasing rental rates for a property that is 30% occupied.

The review appraiser found documented evidence that reveals the subject property has suffered from below-market occupancy for years, as per a prior owner's statement at the TDHCA meeting in July 2013. In addition, TDHCA provided numerous violations of the subject, revealing significant deferred maintenance in 2019.

Under the subheading As Improved – Physically Possible on Page 19, the report states there is a leasing office and event space subject to lease; however, no details of the lease are provided.

A telephone discussion with a prior tenant revealed there is no event space on the subject property.

This section concludes the subject "c*an continue as its pre-existing non-conforming use*," but the report does not state a reason why the improvements are non-conforming.

The original appraisal report does not comply with Standard 1, as it relates to development of the appraisal. Specifically, the report does not comply with SR 1-3(a)(i), (iii), (iv), and (v). With regard to the communication of findings, the report does not comply with SR 2-2(a)(xii).

**4.6   Are the analyses, opinions and conclusions in the Income Capitalization Approach section credible?**

**Conclusion:** No

**Comments:** The "as is" market value conclusion from the income capitalization approach in the original appraisal report is **$18,400,000**.

The "as stabilized" market value in the original appraisal report is **$23,700,000**.

The review appraiser's conclusion of the "as is" market value is **$5,834,600**.

The review appraiser's conclusion of the "as stabilized" market value is **$9,092,000**. This value is predicated on the hypothetical condition the individual buildings are structurally sound and could sustain being lifted, as well as the extraordinary assumption the property's renovation cost is $2,000,000.

The introduction to the Income Capitalization Approach section of the appraisal report states the property is generating $585,504 annual income with only a 30% occupancy; however, there is no documentation or support of the income stream in the body, or in the Addenda of the report.

There is no rent roll.

There is no profit and loss statement.

There is no evidence of any current or historic expenses for the property.

The introduction to this section (Page 21) states there is $234,000 annual income from leasing "event space" and a "leasing office," yet there is no documentation to support this assertion.

According to former tenants of Sabine Park Apartments, the leasing office was used by onsite personnel.

There was no event space, and there was no event spaced leased. One former tenant lived in Unit #527, then later in Unit # 615. The tenant reports there was a vacant building on the property, but it was not marketed, nor was it leased during her tenancy from 2020-2023.

The comparable rentals provided in the report are located in Orange, Port Arthur, Beaumont, Bridge City, and Nederland, Texas. None of the rental information states the units are rent-controlled, nor was there an analysis of any part of the Low-Income Housing Tax Credit (LIHTC) program set up by the Texas State Affordable Housing Corporation (TSAHC).

The subject is a part of this program, and is rent-restricted to the extent that at least 30% (or 60 units) are leased to tenants who qualify for this type of housing.

There is an adequate sampling of apartments in Orange, and there is no need to travel outside the area for a rent survey.

No actual rental rates for the subject were provided – not even the rental rates for the existing 60 tenants.

Omitting details from an income-producing property's rent roll does not comply with SR 1-5(b) and SR 2-1(a) and (b).

Page 25 of the report states the appraisers consider the property to be vacant. A projected income for the units "as is" results in inflated rental rates attributable to comparing a rent-controlled property to a non-rent-controlled property, and the concluded market rents are still considerably above the typical market rental rate for Orange, Texas in January 2022.

Page 26 suggests the appraiser may be aware of the property being rent-controlled by virtue of the heading identified as "Prospective Rent Roll Summary by Rent Regulation Status;" however, there is no analysis of rent-controlled comparables.

According to former tenants, following are rental rates reported:

2018 – 2023 (Unit #33):  2 BR/2 BA - $540/month


2020 – 2023:  (Unit #527)1 BR/1 BA - $500/month
2020 – 2023:  (Unit # 615) 1 BR/1 BA - $550/month
2015 – 2023:  (Unit #32)  2 BR/2 BA - $720/month

The appraisal report concludes a single figure based on an average rental rate per month – despite there being 1 BR, 2 BR, and 3 BR units.

It is industry-standard in the appraisal profession to identify the number of units, then identify the corresponding rental rate for that particular type unit, thus creating a matrix for unit type, number of units, and monthly rental rate.

The appraisal report states the potential gross income (PGI) is $2,781,600, based off a single rental rate of $1,159/month for every unit, regardless of size, location, or condition of the unit. This figure is 30% - 40% above the typical apartment rental rates in Orange.

The operating expense presentation states the projections are based on information provided by the borrower, but there is no documentation evidencing this information in the body or Addenda of the report.

Page 29 presents 7 operating expense comparables; however, there is no identifying source, no address, no physical characteristics of the data, no project name, and no verification provided.

Throughout this section, the appraisers state they rely on the borrower's projections for expenses, along with historical expense information – but, the historical expense information is not provided to the intended user.

There is no lease-up discount analysis to account for the amount of time the units will be unavailable to market.

The reviewer attaches documents that are to be made part of this review that include the analysis of the data used to develop the LIHTC rental rate for each unit type, as well as the market rent.

To develop the "as-is" market value for the subject, a lease-up discount analysis is performed, and the estimated timeframe to lease the property to a stabilized level is 18 months. About half of that time is projected to be be spent renovating the units, section by section.

An extraordinary assumption is made by the reviewer that the buildings are structurally sound, and could sustain being lifted. This s conditional based on whether or not the City grants a building permit. Until a property inspection is performed of each building, and a survey is completed to ascertain how high the buildings will need to be raised, all of the forecasts are speculative in nature.

The reviewer's conclusion of the "as is" market value is **$5,834,600** – some $11,965,400 lower than the conclusion presented in the appraisal report.

Attached to this review are the calculations for the "as is" and "as stabilized" conclusions from the reviewer.

| | |
|---|---|
| 4.7 | Are the analyses, opinions and conclusions in the Sales Comparison Approach section credible? |

**Conclusion:** No

**Comments:**  The appraisal report contains four (4) improved sales. The sales are located in Houston, Galveston, Beaumont, and Baton Rouge.

The original appraisal report concludes a market value via the Sales Comparison Approach of the "as is" market value to be $17,800,000; or, **$89,000/unit**.

The original appraisal report concludes a market value via the Sales Comparison Approach of the "as stabilized" market value to be $23,000,000; or, **$115,000/unit**.

The sales presented in the appraisal report are located 30-160 miles away from the subject.

None of the sales are rent controlled.

The sales are not comparable to the subject in age, amenities, location, or size.

SR 1-1(a) requires an appraiser to "*be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal.*" This includes the selection of comparable sales.

**Comparable 1** is located 130 miles away and is advertised as a luxury apartment community, is in a densely-populated area, and is located next to NASA Johnson Space Center in Houston. The adjustment for location is a downward adjustment of 5%, which is extremely low, as the subject's location is far inferior to this property. The unadjusted sales price per unit is reportedly **$109,354**. This sale is ineffective in supporting a value conclusion for the subject.

**Comparable 2** is located in Baton Rouge and is less than 2 miles from Louisiana State University (LSU). The property was sold as student housing for LSU. This sale is in Louisiana. The subject is in Texas. The unadjusted sales price per unit is reportedly **$142,213**. This sale is ineffective in supporting a value conclusion for the subject for several reasons but, most important, it is located in another state outside Texas.

**Comparable 3** was part of a package portfolio, and the appraisal report indicates the sales price was not confirmed by any of the appraisers. The unadjusted sales price per unit is reportedly **$120,301**. This sale is ineffective in supporting a value conclusion for the subject.

**Comparable 4** is in Galveston, Texas – some two hours south of the subject property. The sales price was not confirmed by any of the appraisers. The unadjusted sales price per unit is **$109,354**. This sale is ineffective in supporting a value conclusion for the subject.

None of the sales included in the report are comparable to the subject property.

There are much more comparable and proximate sales located in Orange County. The review appraiser readily found five sales in Orange and Port Arthur that transpired between 2019 and 2022.

SR 2-1 (a) requires an appraisal report to "*clearly and accurately set forth the appraisal in a manner that will be misleading*."

**Review Appraiser Sales Summary**

**Comparable #1**
Name:  Sussex Manor
Date of Sale:  02/25/2022 (would have been pending on the effective date of appraisal)
Address:  3000 Macarthur, Orange, TX
No. Units:  125
Sales Price:  Unknown; property listed for $8,000,000  **($64,000/Unit**)
Year Built:  1971
Remarks:  Rent-controlled; Remodeled in 2023
Recording Data:  515279
Remarks: This property is included since it is a current listing and represents the upper-end of the market since the sales price has not yet been negotiated.

**Comparable #2**
Name:  The Pointe
Date of Sale:  07/20/2020
Address:  1501 Poole Avenue, Port Arthur, TX
No. of Units:  226
Sales Price:  $10,442,83   **($46,207/Unit**)
Year Built:  1967
Remarks:  Remodeled in 2020-2021
Recording Data:  2020021397

**Comparable #3**
Name:  Camelot Apartments
Date of Sale:  01/15/2020
Address:  3345 West Park Avenue, Orange, TX
No. of Units:  68
Sales Price:  $3,561,300   **($52,372/Unit**)
Year Built:  1971
Remarks:  Renovated in 2018
Recording Data:  483405

**Comparable #4**
Name:  Eagle Crest Apartments
Date of Sale:  02/19/2019
Address:  7071 Bilbo Road S, Orange, TX
No. of Units:  38
Sales Price:  $1,195,313   **($31,456/Unit**)
Year Built:  2009
Remarks:  No known updates
Recording Data:  471139

**Comparable #5**
Name:  Pine Hollow Apartments
Date of Sale:  02/12/2019
Address:  4020 Sikes Road, Orange, TX
No. of Units:  145
Sales Price:  $9,278,800   **($63,992/Unit**)
Year Built:  1999
Remarks:  No known updates
Recording Data:  470557

Through limited research, there were four (4) sales proximate to the subject that range in sales price from **$31,456 to $63,992** per unit.

The median sales price per unit is $52,372. Using this as a benchmark for the subject, a conclusion of $45,000/unit is made that results in an approximate value of $9,000,000 is derived for the Sales Comparison Approach (before adjustments) for the "as stabilized" market value, as of January 24, 2022.

From this conclusion, the cost of renovation and the lease-up discount – reported in the original appraisal to be $2,000,000 – must be deducted to derive the "as is" market value via the Sales Comparison Approach.

A conclusion of $5,742,759 – rounded to **$5,742,800** is concluded for the Sales Comparison Approach to conclude the "as is" market value.

| | |
|---|---|
| 4.8 | Are the analyses, opinions and conclusions in the Cost Approach section credible? |

**Conclusion:** No

**Comments:** The Cost Approach was not analyzed in the appraisal.

Notwithstanding the improvements were constructed in the 1940s, the renovation required to make the property marketable would require a Cost Approach to be analyzed. Detailed cost figures outlining the work to be performed, along with drawings, plans, or specs of the improvements affords the intended user to follow the logic of the appraiser's rationale.

The reviewer is unable to perform a reliable Cost Approach because of so many unknown variables about the condition of the property.

**4.9  Are the analyses, opinions and conclusions in the Reconciliation section credible?**

**Conclusion:** No

**Comments:** A statement in the original appraisal report negating the validity of the Cost Approach is not consistent with the onsite observations and discussions with local market participants relating to the physical condition of the property on the effective date of appraisal. Nor is there validity to negate the relevance of this approach since there are two written reports from TDHCA outlining multiple deficiencies in the physical condition of the subject property.

The Reconciliation refers to the interested appraised as Leased Fee Interest, but this is an apartment complex where tenants are subject to short-term leases, and apartment properties are generally appraised in fee simple estate.

**4.10  Are the exhibits credible?**

**Conclusion:** No

**Comments:** The appraisal report states the property is located in Zone VE, which indicates the appraisers are aware of the requirements for construction in the 100-year flood plain.

After Hurricane Harvey destroyed many coastal areas in Texas in 2017, extra precautionary measures were put in place to ensure the safety of the citizens in the area. In turn, specific building requirements, particularly on properties located in the flood plain, were mandated.

Details of the flood plain impact were overlooked in the appraisal report.

The report states the unit inspected were vacant; however, it is evident from the photographs, there are occupied units. The unit most photographed is the manager's unit (which no longer exists due to the building being razed), and it is reported this unit is a higher grade/quality than a typical unit.

There are no exhibits/document for the proposed renovation, no plans and specs, no rent roll, no profit and loss statements, and no site plan.

**4.11  Is the opinion of value adequately supported by the analysis, opinions and conclusions?**

**Conclusion:** No

**Comments:** The comparable rentals have inflated quoted rental rates.

There is minimal to no support for the proforma income and expenses.

There are more proximate comparable properties to use as rent comps – and, there are properties with rent restrictions available to have incorporated into the report.

The improved sales are not comparable, as was explained in Section 4.7.

A Cost Approach should have been included in the report.

The "as is" and "as stabilized" values presented in the original appraisal report are not supported with appropriate market data.

There is no discussion of the rent control in place on the effective date of appraisal. This was ignored by the appraisers.

| 4.12 | Final Comments |
|---|---|

Overall, there are enough deficiencies in the original appraisal report to conclude the appraisal results are not credible. Specifically, no historic data was considered or analyzed, the prospective sale of the subject was not properly analyzed.

The true property history was not disclosed.

The potential gross income was not based on comparable apartment properties.

The sales data is not comparable. There are many more proximate apartment rentals and sales to compare to the subject, and the reviewer has provided this information in the review.

**Section 5.0 - Assumptions and Limiting Conditions**

BY THIS NOTICE, ALL PERSONS AND FIRMS REVIEWING, UTILIZING OR RELYING UPON THIS REPORT IN ANY MANNER, BIND THEMSELVES TO ACCEPT THESE ASSUMPTIONS AND LIMITING CONDITIONS.

Do not use this report if you do not so accept. These conditions are a part of the review appraisal report; they are a preface to any value conclusion, certification, definition, fact or analysis.

1. The data in the work under review is assumed to be true and correct. Unless noted otherwise, the reviewer has not attempted to obtain additional information or data. The reviewer's opinions and conclusions, unless otherwise noted, are based exclusively and entirely on the analysis, opinions and conclusions contained in the work under review.
2. The reviewer assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the reviewer render any opinion as to the title, which is assumed to be good and marketable.
3. The reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.
4. Information, estimates, and opinions furnished to the reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items can be assumed by the reviewer.
5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the reviewer is affiliated.
6. Neither all, no any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report.
7. No change of any item in the review report shall be made by anyone other than the reviewer and the reviewer shall have no responsibility for any such unauthorized change.
8. Unless otherwise noted, the reviewer's opinion of value is based on the same type and definition of value stated in the work under review.

| Section 6.0 - Certification |
|---|

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of the work under review and no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.
- I have performed no services, as an appraiser or any other capacity, regarding the property that is the subject of the work under review within the three-year period immediately preceding the agreement to perform this assignment.
- I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.
- Our compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favor the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.
- Our analyses, opinions, and conclusions were developed, and this review was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and the Code of Ethics of the Appraisal Institute.
- Andrea Fahrenthold inspected the subject property, but not the comparable rentals and sales. Ms. Fahrenthold conducted an exterior inspection of the subject property on August 8, 2024.
- No one provided significant appraisal or appraisal review assistance to the person signing this certification.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, Andrea M. Fahrenthold and Steven S. Albert, MAI, SRA has complied with the requirements of the continuing education program for Designated Members of the Appraisal Institute.

**Respectfully Submitted,**

*[signature]*

Andrea M. Fahrenthold, MAI
Certified General Real Estate Appraiser
Texas State Certificate #1320492-G
Expiration: 4/30/2025

*[signature]*

Steven S. Albert, MAI, SRA
Certified General Real Estate Appraiser
Illinois Certified General Real Estate Appraiser #553.000219
Expiration: 9/30/2025

# Steven S. Albert, MAI, SRA

## Education

- Bachelor of Science Degree Business Management, Southern Illinois University; Carbondale, Illinois

- Successfully completed courses from the Appraisal Institute and other Course Providers:
  Fundamentals of Relocation Appraising | Residential Consulting | Advanced Applications | Discounted Cash Flow Analysis | Appraisers Legal Liabilities | Real Estate Appraisal Principals | Basic Valuation Procedures | Standards of Professional Practice Capitalization Theory and Techniques (A & B) | Case Studies in Real Estate Valuation | Valuation Analysis and Report Writing Residential Valuation | Appraisal Reporting of Complex Residential Properties | Fair Housing Issues and Cultural Awareness Feasibility Analysis and Highest and Best Use – Non-Residential | Valuation of Detrimental Conditions in Real Estate Condemnation | Real Estate Risk Analysis | Appraisal Reporting for Fair Lending | Reviewing Residential Appl. and Using Fannie Mae Form 2000 | FHA and the Appraisal Process | 7 Hour National USPAP Equivalent Course | Appraisal of Nursing Facilities | Eminent Domain and Condemnation | 2 Hour Michigan Law Seminar  Business Practices and Ethics | Appraising Convenience Stores | Supervising Appraisal Trainees | Real Estate Appraisal Operations | Analyzing Distressed Real Estate | Appraising Manufactured Housing | Understanding the New Interagency Appraisal and Evaluation Guidelines

## Teaching Credentials and Related Experience

- Staff Instructor, Joliet Junior College, 1986 – 1990, *Valuation Principals and Procedures, Income Property Appraising and Capitalization Techniques*
- Approved Associate Instructor, Appraisal Institute, 1990 – 1995

## Committees, Councils and Groups

- Real Estate Advisory Committee Member, Joliet Junior College, 1987 – 1992
- Grievance Committee Chair of the Ethics Administration Division, Appraisal Institute, 2005
- MAI Experience Review Committee, Appraisal Institute 2000 – 2001
- Public Relations Committee, Appraisal Institute, 2006 – 2007
- Industry Advisory Council (IAC) – The Appraisal Foundation, Current
- Collateral Risk Network (CRN), Current
- Illinois Collation of Appraisal Professionals (ICAP), Current
- Approved Investigative Reviewer for the Appraisal Departments for the States of Tennessee, Nevada and Utah
- Residential Appraiser Committee (AI-RAC) – Appraisal Institute

## Recent Expert Witness Testimony

- In re Limonciello, Case No. 05 B 39333, Adv. No. 07 A 909 (Bankr. N.D. Ill. May. 19, 2009)
- 231 Scott LLC, et al. v. Lakeside Bank, et al., Case No. 11L006136, Consolidated with Case No. 09 CH17899 (Cook Cty. Cir. Ct.)
- IRMO: Weinberger, Case No. 13D2106, Circuit Court, 18th Judicial Circuit, DuPage County, IL
- Felton A. Spears, Jr., et al v. First American eAppraiseIT, Case No. 5:08-CV-00868-RMW (N.D. Cal.)
- Gaudie v. Countrywide Home Loans, Inc. et al., Case No. 1:2009 cv 02450 (N.D. Ill.) | FDIC v. Cromer, et al., Case No. 2:2010 cv 04249 (E.D.N.Y.)
- Llano Financing Group, LLC v. Perry H. Brown, Jr., et al., Case No. 15L008719 (Cook Cty. Cir. Ct.)
- RFC & ResCap Liquidating Trust Litigation, Omnibus Deposition, Case # 13-cv-03451, 12/12/2017
- Residential Funding Company, LLC vs. Home Loan Center, Inc. Deposition, Case # 14-CV-1716, 12/14/17)
- Residential Funding Company, LLC vs. Standard Pacific Mortgage, Inc. Deposition, Case # 13-CV-03526, 1/15/18
- Residential Funding Co., LLC and ResCap Liquidating Trust vs. Colonial Savings F.A. Deposition, Case # 13-CV-03474, 1/16/18
- RFC & ResCap Liquidating Trust Litigation, Global Sample Deposition, Case # 13-CV-03451, 1/25/18
- Residential Funding Co., LLC vs. Decision One Mortgage Co., LLC & HSBC Finance Corp. Deposition, Case #14-CV-1737, 2/9/18
- Residential Funding Company, LLC vs. BMO Harris Bank, N.A., D/B/A M&I Bank FSB Deposition, Case # 13-CV-03523, 2/16/18
- IRMO: Ross, Case No. 2014 D 005209, Circuit court of Cook County, Illinois
- IRMO: Conroy, Case No. 2017 D 5639, Circuit Court of Cook County, Illinois
- IRMO: Grant, Case No. 16 D 2323, Circuit Court of Cook County, Illinois
- IRMO: Salviola, Case No. 17 D 008494, Circuit Court of Cook County, Illinois
- IRMO: Sanez, Case No. 18 D 430135 Circuit Court of Cook County, Illinois
- IRMO: Bess, Case No. 18 D 1496, Circuit Court of Lake County, Illinois

- IRMO: Lindell, Case No. 18D 00001224, Circuit Court of Lake County, Illinois
- IRMO: Pleda, Case No. 2017 D 6204, Circuit Court of Cook County, Illinois
- IRMO: Polk, Case No. 2015 D 10934 Circuit Court of Cook County, Illinois
- IRMO: Ritacca Case No. 21 D 1711 Circuit Court for the Nineteenth Judicial Circuit, Lake County, IL
- IRMO: Manthey, Case No. 2021 D 10372, Circuit Court of Cook County
- Sharestates Investments, LLC v. Republic Valuations NY, LLC;  Case #; 510899/2021; Supreme Court, Kings County, New York, Commercial Division
- IRMO: Hinaris; Case No. 2022 D2 30310,  Circuit Court of Cook County, Illinois
- IRMO: Moran: Case No. 22 DN 453, Circuit Court of Cook County, Illinois

## Professional Affiliations and Memberships

- MAI, SRA, Appraisal Institute. Certified under the Mandatory Program of Continuing Education
- Federal Housing Authority Certified Appraiser

## Professional Experience

-  President, previously Executive Vice President; Allstate Appraisal – 1993 to present
-  Investment grade property staff appraiser; Roe Westberry & Associates, Palm Beach, Florida – 1992
-  Staff appraiser, then chief review appraiser; Allstate Appraisal – 1986 to 1991
-  Qualified as an Expert Witness in state and federal courts in Illinois and New York state courts in numerous cases involving divorce, condemnation, partition suits, damage claim resolution, RMBS cases, and various other litigation issues.
-  Assessing Appraisals and Other Appraisal Vendors for Investment Banking Firms:  Review services for investment banking assessments of pools of mortgages available for purchase, in excess of 7,000 since 2008.
-  Assessing Appraisals for Mortgage Insurance Companies:  Mortgage insurance claim investigations, in excess of 50,000 since 2003
-  Assessing Appraisals for Fannie Mae:  Appraisal reviews for the repurchase demand investigations by Fannie Mae, in excess of 25,000 reviews nationally since 1992
-  Assessing Appraisals for Lenders:  Pre- and post-funding appraisal review services for lenders throughout the country, in excess of 250,000 appraisal reviews for lenders since 1991
-  Managing the Appraisal and Appraisal Review process for the Federal Deposit Insurance Corporation (FDIC): Appraisals in connection with FDIC's management and sale of real estate assets of failed banks held in receivership, in excess of 12,000 appraisals since 2008

## Licensure

| State | License Number | Expiration Date |
|---|---|---|
| State of **Illinois** Certified General Appraiser | #553.000219 | 09/30/2025 |
| State of **Michigan** Certified General Appraiser | #1201073664 | 07/31/2026 |
| State of **Indiana** Certified General Appraiser | #CG49400228 | 06/30/2026 |
| State of **Tennessee** Certified General Appraiser | #5626 | 03/10/2025 |
| State of **Wisconsin** Certified General Appraiser | #2384-10 | 12/14/2025 |
| State of **Minnesota** Certified General Appraiser | #40519550 | 8/31/2026 |
| State of **Utah** Certified General Appraiser | #11513357-CG00 | 10/31/2025 |
| State of **Arizona** Certified General Appraiser | #CGA-1004255 | 9/30/2025 |
| State of **Georgia** Certified General Appraiser | #378754 | 05/31/2025 |
| State of **Maine** Certified General Appraiser | #CG4251 | 12/31/2024 |
| State of **Nevada** Certified General Appraiser | #A.0208071-CG | 12/31/2025 |
| State of **Virginia** Certified General Appraiser | 4001018311 | 06/30/2026 |